## Feeser Estate (No. 2)

*Harry C. Elsesser, Jr.,* and *Bulleit & Bulleit,* for exceptant.

*Swope, Brown & Swope,* contra.

SHEELY, P. J., January 16, 1954.—Decedent died February 8, 1950, leaving a will under which he gave to his wife, Effie M. Feeser "only such part of my residuary estate as she shall be entitled to under the laws of the State of Pennsylvania, and no more." He was survived by his wife and by two sons to a previous marriage who were named as executors of the will.

The account filed by the executors shows personal assets of $2,620.74, and real assets of $40,900, or total assets of $43,520.74. Credits were claimed in the amount of $44,521.47, leaving a deficit of $1,000.73 and, consequently, nothing for distribution to the

widow. The widow filed six exceptions to the account including, inter alia, an exception to the allowance of the claim of Burnell A. Feeser and Wilbur P. Feeser, the accountants, based upon a judgment note in the amount of $25,000. The auditor, in a careful and well-considered report, disallowed the claim and surcharged the accountants with that amount, and they have now excepted to the auditor's report. The auditor overruled the other five exceptions and the widow has not renewed them.

The crux of the matter before the court lies in the auditor's fifth finding of fact that "The decedent made, executed, and delivered unto attorney Harry C. Elsesser, Jr., a certain judgment note in the amount of $25,000, payable to Burnell A. Feeser and Wilbur P. Feeser, to be delivered by the attorney to the payees upon the death of the decedent. Said note intended to be a gift", and his fifth conclusion of law that "The decedent attempted to make a gift inter vivos of a judgment note in the amount of $25,000 unto his sons, Burnell A. Feeser and Wilbur P. Feeser, which was in effect an attempt to dispose of his real estate or the proceeds therefrom contrary to law."

The will of decedent, above referred to, was dated December 18, 1948. The testimony shows that on February 14, 1949, decedent consulted Harry C. Elsesser, Jr., a member of the York County bar, relative to the disposition of his estate. Mr. Elsesser testified:

"Mr. Feeser came into my office and wanted to work out some arrangement whereby his property would descend, would go for the benefit of his two children. So a discussion followed concerning just what his property consisted of. He advised me that he owned two farms and a home. . . . The question then devolved as to whether he could convey any of this property to his children and, of course, upon questioning him I learned that he was married, and he stated that his

wife would not join in the signing of any deeds. I, thereupon, suggested to him that he make a gift to his two sons, and being familiar with a Supreme Court decision in the case which I can cite to you, I, thereupon, advised him that the only thing I knew he could do was to execute a judgment note payable upon his death, and to deliver it either to the boys or to some third person with instructions to deliver it to the children upon his death." Mr. Elsesser also testified that there was no discussion as to provisions for the wife—"Mr. Feeser's sole intent and purpose seemed to be that his sons should have his property", and that he did not know that Mr. Feeser had a will—that question was not discussed.

The note which was executed on February 14, 1949, was the ordinary form of waiver judgment note, payable to the two sons, and contained the words: "This note is not to be executed until after my death." At the same time decedent executed another paper (Exhibit 2) stating that he had deposited the note "payable upon my death, in equal shares to my sons . . ." with Mr. Elsesser, and directing him to deliver the note to the sons upon his death. The paper stated it was his intention by the execution of the note and the delivery of it to make an irrevocable gift to his sons and the delivery was thereby declared to be irrevocable. Mr. Elsesser signed a statement on the same paper certifying that he had received the note and that upon the death of Mr. Feeser he would deliver it to the sons. This testimony fully supports the auditor's fifth finding of fact.

There was also introduced in evidence another paper (Exhibit 4) dated March 17, 1949, with the writing:

"All of my farm machinery belong to Burnell as of today", and signed by decedent. As the result of the transfer of the farm machinery to Burnell Feeser, the only personal assets of decedent at the time of his

death were household goods and a Pontiac automobile valued at $1,000 on which there was a lien of $774.85.

The attorney for decedent relied upon Rynier Estate, 347 Pa. 471 (1943), as authority for his advice to decedent. He did everything that was indicated by the opinion in that case as necessary to constitute a valid gift inter vivos. The note was under seal; the maker intended to make a gift of the note; it was delivered to the attorney with explicit instructions to deliver it to the sons after the death of the maker. The accountants rely upon the authority of that case in support of their claim upon the note, and particularly upon the statement:

"Decedent had a perfect right to give away all or any part of her property, and, if she actually divested herself of ownership and there was no fraud (as to which there is here no claim), it is immaterial that her husband was thereby deprived at her death of his distributive share in her estate: . . . ."

There are two distinctions between the Rynier case and the present case, however. In the Rynier case the claim was made against personal property (see 48 Lanc. 424), while in the present case the claim is made against proceeds of the sale of real estate. In the Rynier case there was no allegation of fraud, while such allegation is made in the present case.

It is settled that a voluntary bond payable at the maker's death is, both in law and equity, a gift of the money and is as irrevocable as any other obligation under seal, which imports a consideration: Mack and Person's Appeal, 68 Pa. 231 (1871) ; Hummel's Estate, 161 Pa. 215, 217 (1894). It is also settled that husband or wife, without the consent of the other, may dispose of his or her individual personal property during coverture, whether by gift, grant in trust, or otherwise, and such disposition of personalty is not in fraud of the marital rights of either party: DeNoble v. DeNoble

et al., 331 Pa. 273, 276 (1938). It is clear, therefore, that if the claim on the note in the present case were being asserted against personal property the claim would be good and would have to be allowed. All of the appellate court cases cited, however, are cases relating to claims involving personal property, and it is necessary to understand the reasons for allowance of such claims.

In Beirne v. Continental-Equitable Title & Trust Co., 307 Pa. 570, 575 (1932), decedent executed a deed of trust of personal property for the declared purpose of eliminating his wife from any interest in the assets conveyed thereby. The court said (page 577):

"There are many early decisions which hold that, so far as concerns his personal estate, a husband may do what he pleases with it, and the wife cannot be heard to complain. . . . The reason for this conclusion is well stated in the first of the cases cited, 6 S. & R. 535-6: 'A man can never be said to commit a fraud on the contingent rights of others, where it depends on his own act whether they shall ever exist. The rights of (the wife), other than to her common law dower, he could defeat in the same manner as he could the succession of his heirs.' So, also, it was said in Lines vs. Lines, 142 Pa. 149, 165: 'It is the settled law of this State that a man may do what he pleases with his personal estate during his life. He may even beggar himself and his family, if he chooses to commit such an act of folly. When he dies, and then only, do the rights of his wife attach to his personal estate.' Those decisions are all based on the general rule that if one has the legal right to do a particular thing, the law will not inquire into his motive for doing it: . . ."

The court in that case further said (p. 577):

". . . if actual fraud upon the other spouse is shown to have been the real cause of the transfer of the assets, the general rule is applied, as in other cases of actual

fraud, and the conveyance is held void. . . . 'But the fraudulent intent is the indispensable foundation for any such limitation of his control' . . . , and this is not shown merely by proving that 'the husband's intent (was) to deprive the wife of her distributive share in his estate as widow'. . . ."

Counsel in the Beirne case had advised the deed of trust in reliance upon the case of Windolph v. Girard Trust Company, 245 Pa. 349, 363 (1914), in which the court said with relation to the right of a person to dispose of his personal property as he saw fit:

"This power arises from the fact that he is the absolute owner and hence may make a gift, declare a trust, or otherwise dispose of his personal property at his pleasure. During his life his wife and children have no vested interest in his personal estate, and hence they cannot complain of any disposition he sees fit to make of it. Their right to his property attaches only at his death."

The reasons given for the rule applied to personal property do not exist in the case of real estate. While the husband is the absolute owner of his personal property, in the case of real estate the wife has an inchoate right of dower in her husband's property. In Killinger v. Reidenhauer, Admr., 6 S. & R. 531, 534 (1821), the court said:

"By the marriage, the widow has an initiate right to the third part of all the lands and tenements the husband was seized of at any time during the coverture: At the common law, the husband can, by no act of his own, strip her of this right; it is not liable for his debts; he cannot, by a mortgage, charge them on it. This initiate title of the wife, can be barred only by her levying a fine, or suffering a recovery. In Pennsylvania, where lands are considered as chattels for payment of debts, the husband's lands may be levied on and sold, and the wife lose her dower. So here, a

mortgage given by the husband will bind the dower right; all the interest may be levied on, and sold on a levari facias, without regard to the wife's right of dower; but a mere voluntary mortgage, (much less a fraudulent one, made for the purpose of defeating the inchoate right of the wife,) cannot bind her, for this would be in fraud of the law, and in fraud of the right accrued directly on the marriage; initiate on the moment of marriage, consummate on the death of the husband; a right much respected in law; highly favoured, next to liberty and life."

In that case it was shown that decedent gave a mortgage on his real estate, without consideration, and for the sole purpose of preventing his wife from getting any part of the mortgaged premises. It was held that the mortgage was void as to the dower interest of the wife.

In Waterhouse v. Waterhouse, 206 Pa. 433 (1903), the court said:

"The power and duty of the court to aid the wife sought to be defrauded is well settled. In the very late case of Wells vs. Bunnell, 160 Pa. 460, we said: 'The law will lay its hands upon a fraudulent scheme to deprive the wife of her dower and will open or stay proceedings upon a judgment confessed without a full bona fide consideration.'"

This distinction between the rule applicable to personal property and the rule applicable to real estate is clearly stated in Cancilla v. Bondy et al., 353 Pa. 249 (1945). The court there said (page 252):

"It has many times been judicially declared in Pennsylvania that a man may do what he pleases with his personal estate during his lifetime since his wife has no right, title or interest in such property until after his death; therefore he may make a gift of it even though he does so for the purpose of preventing his wife from inheriting any portion of it; the only limita-

tion is that he should actually part with the title and not retain any collusive or secret ownership. With real estate, however, the situation is entirely different because a wife has an inchoate interest in her husband's real property; therefore, while he may mortgage such property if the transaction is bona fide and for a consideration, he cannot deprive his wife of her dower rights, without her consent, by creating a voluntary mortgage or judgment, since the giving of such a mortgage or judgment would be equivalent to a pro tanto conveyance of the real estate in fraud of her dower rights: . . . .

"The execution of the mortgages by Cancilla to Lima was a patently crude attempt to destroy plaintiff's dower rights in the property and was a poor subterfuge for a will which could not have been effectual for the purpose. The mortgages were therefore voidable as to her."

We do not agree with counsel for the accountants that this statement by the court was dictum. The statement was made in passing directly upon a question raised in the case, but whether or not it be considered as dictum, the statement is a clear statement of the law in Pennsylvania and is fully supported by authority and reason.

The accountants rely upon Mornes Estate, 79 D. & C. 356 (1951), stating that in that case a fund derived from the sale of real estate was used for payment of decedent's notes executed under circumstances similar to the case at bar. We find nothing in that case to support the statement that the notes were paid from the proceeds of the sale of real estate. If that is a fact, then we must disagree with the decision in that case. The decision in Kerr's Estate, 39 Del. Co. 205 (1951), also cited by the accountants, was based on the fact that there was no proof to overcome the presumptive

validity of the mortgage given without the wife's joinder. In the present case it is conceded that there was no consideration for the note and that it was given for the purpose of defeating the wife's right of dower.

In this case there can be no doubt of decedent's purpose. The testimony of the attorney makes it clear that it was his intention to have his real estate descend to his sons and that the note was given to carry out that purpose. He divested himself of practically all of his personal property so that the only asset from which the note could possibly be collected was the real estate. His will contained a direction to his executors to sell the real estate, thereby effecting a conversion. The accountants, with the assent of 'the widow, obtained leave of court to become purchasers of the real estate, undoubtedly intending to use decedent's voluntary note as part payment. To allow the transaction to stand would mean that decedent had accomplished his purpose of having his real estate descend to his sons and of depriving his widow of her dower interest therein, or of the share of his estate provided by the Intestate Act of April 24, 1947, P. L. 80, to be given her in lieu and full satisfacton of her dower at common law: Section 5(a). But, under the authorities cited, the note cannot be collected from the proceeds of the real estate so as to effect this result, and the scheme was a fraud upon the rights of the widow and was voidable as to her. The note would be valid as to other persons interested in the estate but, since the only other persons interested were the accountants, the auditor correctly surcharged them with the amount of the note.

And now, January 16, 1954, the exceptions to the report of the auditor in the above estate are overruled; the auditor's report is confirmed absolutely, and the accountants are directed to make distribution in accordance therewith.