## Pengelly Estate.

Argued April 15, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ. Appeal, No. 67,

*Charles H. Weidner,* with him *Stevens & Lee,* for appellant.

*Franklin E. Kantner,* with him *Llewellyn R. Bingaman* and *Moss, Rieser & Bingaman,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, June 26, 1953:

The question here involved is the validity of an instrument purporting to create an inter vivos trust.

James H. Pengelly died testate on February 28, 1947 survived by his wife, Katie W. Pengelly. His will, dated December 13, 1945, revoked all prior wills and was duly probated March 4, 1947. Letters testamentary were issued to F. Edwin Titlow who also was named trustee under a "Living Trust Agreement" dated October 22, 1943, the subject matter of this litigation.

The will gave nothing to the widow who elected to take against it. No children were born of the marriage. Following her election to take against the will, the widow petitioned for and the court granted a citation directed to all parties in interest to show cause why the inter vivos trust instrument, in which she was not included as a beneficiary, should not be declared null and void as to her and why the property held by Titlow as trustee thereunder should not be decreed to be assets of the decedent's estate and distributed to the persons entitled to the estate. After hearing, the lower court entered a final decree dismissing the petition and citation. The widow, Katie W. Pengelly, appeals therefrom.

Appellant contends that the trust instrument was testamentary and illusory in character, that it created nothing more than an agency relationship between the

decedent and the trustee, that it was not made in good faith but for the purpose of defeating appellant's rights in the property transferred by the agreement, and for these reasons ineffective to bar her rights as decedent's widow.

It appeared from the testimony taken that decedent and his wife, the appellant, separated in 1908; that at or about the time of this separation an acquaintance and friendship sprang up and grew into an intimacy between the decedent and Miss Katharine Bumersbach that culminated in the latter becoming the decedent's housekeeper in a home provided by the decedent, and where he was living at the time of his death. The two took trips to the seashore together and went on visits to Miss Bumersbach's relatives. Appellant claimed that the relationship was meretricious.

The trust instrument transferred to Titlow as trustee certain bonds and stocks listed therein and provided in paragraph 1 as follows: "1. The Trustee shall hold, manage, invest and administer the said fund and all additions which may from time to time be made thereto and be held by the Trustee on account of the trust hereby created and all reinvestments and substitutions thereof, and shall have power and authority, *with the approval of the Settlor during his lifetime,* and thereafter at his, the said Trustee's sole and uncontrolled discretion, to alter, vary, change, transfer and retransfer investments and reinvestments from time to time without being restricted to what are known as legal investments for Trustees under the Laws of the Commonwealth of Pennsylvania, the Settlor hereby expressly authorizing the said Trustee, *with the approval of the Settlor during his lifetime,* and thereafter in the absolute discretion of the said Trustee, to invest and re-invest the whole or any part of the trust fund in the stock or bonds of any corporation listed on the

New York Stock Exchange, New York Curb Exchange, or other corporation listed on the New York Stock Exchange, New York Curb Exchange, or other recognized exchange duly registered with and licensed by the Federal Securities and Exchange Commission, hereby releasing and exonerating the said Trustee from any and all responsibility for any loss or depreciation of such investments due to error of judgment in the exercise of the authority herein conferred, or otherwise howsoever, excepting only for gross negligence and wilful malfeasance or fraud. The Settlor hereby gives his approval to all of the original investments comprising said fund as hereinbefore listed in detail.". (Emphasis supplied).

Paragraph 2 of the agreement provided that after payment of charges and expenses the trustee shall pay the income from the fund, semiannually or more frequently as may be convenient, to the settlor for and during his lifetime, and then provided that upon his death the net income be paid in the same manner to Miss Bumersbach for and during her natural life and then for conversion of the fund into cash and distribution one-half to relatives of the settlor and the other half to relatives of Miss Bumersbach.

Paragraph 3 of the trust agreement reads in pertinent part as follows: "3. The Settlor expressly reserves the right or privilege, in the event that the income of the trust fund during his lifetime shall be insufficient for his comfortable maintenance and support, to require such payments out of the principal of the trust fund from time to time *as may in his opinion be necessary,* and all such payments out of principal as may be required by the Settlor shall be made promptly by the said Trustee without any liability on his part toward any of the beneficiaries named in paragraph 2 hereof, who shall forfeit their interest in the trust fund

in the event that they shall question the propriety of any payment so made by the said Trustee to the Settlor. . . .". (Emphasis supplied).

At the time the securities were assigned to Titlow as trustee under the trust instrument the value thereof was $11,845.50. The value of the trust fund as of February 28, 1947 was $25,752.16. Nothing was contributed by Pengelly to the principal of the trust after the agreement was executed. The inventory of the personal estate of the decedent amounted to $12,227.89, and the decedent also left real estate, the value of which does not appear.

The validity of inter vivos trusts is a subject matter that has frequently come before our appellate courts. While the cases so vary in their facts as to prevent the application of a general governing principle of law, some definite rules have emerged. They are summarized in *Shapley Trust*, 353 Pa. 499, 46 A. 2d 227, where at pps. 500, 501 Mr. Justice ALLEN M. STEARNE, speaking for the Court, said: ". . . It will suffice to say that where the deed [trust instrument] vests a present interest in the beneficiaries it is a valid inter vivos trust. It is not rendered testamentary in character because the settlor reserves a beneficial life estate, and in addition, a power to revoke or modify in whole or part. See Windolph v. Girard Trust Company, 245 Pa. 349, 91 A. 634; Beirne v. Continental-Equitable Title & Trust Co., 307 Pa. 570, 161 A. 721; Fidelity Trust Company, Admr., v. Union National Bank of Pittsburgh et al., 313 Pa. 467, 169 A. 209; Reese's Estate, 317 Pa. 473, 177 A. 792; Section 57 (1) Restatement, Trusts; Scott on Trusts, Section 57.1. Where, however, settlor in addition to the reservations above mentioned, reserves the power to control the trustee as to the details of the administration of the trust, and thus makes the trustee merely the agent of the settlor, the scheme be-

364

comes testamentary as to dispositions intended to take
effect after death. See Turner v. Scott, 51 Pa. 126;
Frederick's Appeal, 52 Pa. 338; Rick's Appeal, 105 Pa.
528; Beaumont's Estate, 214 Pa. 445, 63 A. 1023; Hur-
ley's Estate, 16 D. & C. 521; Section 57 (2) Restate-
ment, Trusts.".

It was also pointed out in the opinion in *Shapley
Trust* that a power to consume may be the equivalent
of a power to revoke.

Therefore, in determining whether the trust instru-
ment in the present case, which gave the settlor the en-
tire beneficial interest during his lifetime, operated
to pass eo instanti the other beneficial interests set forth
therein or, on the other hand, was testamentary in char-
acter and death of the settlor a prerequisite to the
vesting of such beneficial interests, controlling con-
siderations before us are (1) was there a power to con-
sume equivalent to a power to revoke; (2) was there
a reservation of power to control the trustee in the
administration of the trust? We are of the opinion that
both questions require affirmative answers.

As to the power to consume, appellees argue that
the right to make withdrawals was dependent upon
necessity for "comfortable maintenance and support".
But it is to be noted that under the provision of para-
graph 3, such payments out of principal are to be made
to settlor from time to time "as may *in his opinion* be
necessary" and "made promptly" by the trustee "with-
out any liability on his part toward any of the bene-
ficiaries . . . who shall forfeit their interest in the trust
fund in the event that they shall question the propriety
of any payment so made. . .". Thus the trustee had no
discretion as to the amounts to be withdrawn, no fear
of liability to anyone except the settlor, and if the
former did not comply with a request by the latter, he
would violate the terms of the provision. The settlor

could withdraw any part or the whole of the fund at any time. Under the circumstances the power to consume amounted to the power to revoke.[1]

As to the reservation of control of the trustee in the administration of the trust, appellees stress that in the language employed in *Shapley Trust,* above quoted, and in Restatement, Trusts, Section 57 (2) cited to the text, the control must be complete control of the management of the trust and that here the provision in paragraph 1 that all reinvestments and substitutions must be "with the approval of the Settlor during his lifetime" constituted a veto power only in the settlor. Whether or not the language of this provision is subject to such characterization, in substance and effect the settlor could exercise complete control over the composition of the trust fund. In the last sentence of paragraph 1 the settlor gave his approval to all of the original investments comprising the fund as listed in the trust instrument. No change therein could be made without his approval.

Some light is thrown upon the relationship between the settlor and the trustee by the testimony of the latter. For seven years prior to the execution of the trust instrument Titlow had attended to the buying and selling of securities for the decedent, apparently acting in the capacity of investment adviser. Called on cross-examination by appellant's counsel, he testified that he continued buying and selling securities on the decedent's instructions after the execution of the trust instrument in the same manner as before its execution. When turned over to appellees' counsel for direct examination, Titlow said that when he testified

---

[1] This being true, a provision in the trust instrument (paragraph 6 thereof) as to its being irrevocable except with the consent of the trustee, is rendered meaningless and ineffective.

that he bought or sold on the decedent's instructions, he really meant with the decedent's approval and that suggestions as to purchase or sale originated with Titlow and the decedent would then agree or disapprove of Titlow's suggestions to buy or sell. Giving consideration to all of Titlow's testimony, it is apparent that the relationship between him and the decedent remained the same before and after the execution of the trust agreement. It may be noted that Titlow's accounts, which were introduced into evidence, both before and after the execution of the trust agreement, were kept in the name of "F. Edwin Titlow, Trustee for James H. Pengelly" and the only change in the situation was that prior to the existence of the trust agreement the securities remained in the name of the decedent while after its execution they were transferred to the name of Titlow as trustee. The relationship was in fact that of principal and agent. Titlow made suggestions as to the sale and purchase of securities but the decedent gave the instructions as to what should be bought or sold. Behind the mask of the colorable language employed, the decedent actually reserved the power to control the management of the trust.

It is unnecessary to find that there was intention on the part of Pengelly to defraud appellant of her marital rights. It is sufficient that the trust instrument was testamentary in character. Nothing but an agency relationship for the convenience of the settlor was created (or continued) and no posthumous beneficial interests could vest under its provisions until his death; and such testamentary provisions were revoked by his will. See the opinion of Judge GEST in *Hurley's Estate,* 16 D. & C. 521, cited with approval in *Shapley Trust,* supra.

Bearing on the testamentary character of the trust instrument is the fact that the same parties who were

beneficiaries therein are also the beneficiaries under the decedent's will. His scheme of distribution is the same. The language employed is consistent with the conclusion that the instrument was executed animo testandi.

In arriving at a different conclusion in the present case, the learned judge of the court below relied upon decisions which are distinguishable. In *Dickerson's Appeal,* 115 Pa. 198, 8 A. 64, a father set up trusts for his children fourteen years before his death. He received no benefit from the trust and the decision is authority only for the proposition that a reserved right of revocation is not inconsistent with the creation of a valid trust.

In *Houston's Estate,* 276 Pa. 330, 120 A. 267, in which the opinion of the lower court, adopted by the Supreme Court, was written by Judge GEST who also wrote the opinion in *Hurley's Estate,* supra, the settlor had no right of withdrawal. The opinion states, ". . . She [the settlor] reserved no right of revocation, nor did she retain the right of control, for her power exercisable jointly with the trustee to change investments is a very different thing; . . .". In the instant case there was no joint control as to change in investments. Titlow, the trustee, made suggestions with respect thereto, but the settlor was the sole arbiter.

In *Dolan's Estate,* 279 Pa. 582, 124 A. 176, the income of the trust created was immediately payable to named beneficiaries and control as to investments was not retained by the settlor but given to settlor's husband.

In *Windolph v. Girard Trust Company,* 245 Pa. 349, 91 A. 634, the power to control was not complete as in the instant case but a limited control only. The trustee was given complete power of investment in legal securities of the trustee's own selection but not per-

mitted to invest in other than legal securities without the settlor's consent.

In *Sheasley Trust*, 366 Pa. 316, 77 A. 2d 448, a father, for a stated consideration of $20,100, executed a deed for certain real estate together with certain personal property to his sons who contemporaneously executed a declaration of trust. We do not consider the case analogous or apposite to the situation here involved. There was no agency relationship as in the instant case.

In none of the foregoing cases do we find all of the factors determinative of the testamentary character of the instrument involved as are found in the present case, namely, a reservation to the settlor of the entire beneficial interest for life, a power to consume equivalent to the power to revoke, and what in practical effect constituted complete power to control the trustee in the administration of the trust, together with evidence that the trust instrument merely effected a continuation of a previously existing agency relationship.

Appellees cite the comment appearing under Section 57 (2) of Restatement, Trusts, that "In determining whether the reserved powers are so great as to make the trustee an agent of the settlor, one of the factors to be considered is the formality of the transaction. Thus, if the transfer to the trustee was by a deed formally executed and recorded, the conclusion that the trustee was also the agent of the settlor would be less likely to be drawn than if the transfer were less formally evidenced.". However, where, as we have found in the present case, the reserved power of control was complete, no amount of formal embellishment can change actuality. Nor can the use of the words "trust" or "trustee" change the true character of the instrument: *Tunnell's Estate*, 325 Pa. 554, 190 A. 906.

Section 11 of the Estates Act of 1947, P. L. 100, 20 PS §301.11, provides: "A conveyance of assets by a person who retains a power of appointment by will, or a power of revocation or consumption over the principal thereof, shall at the election of his surviving spouse, be treated as a testamentary disposition so far as the surviving spouse is concerned to the extent to which the power has been reserved but the right of the surviving spouse shall be subject to the rights of any income beneficiary whose interest in income becomes vested in enjoyment prior to the death of the conveyor.". The effective date of the Act was January 1, 1948 so that appellant cannot rely thereon since the Act does not operate retrospectively: *McKean Estate*, 366 Pa. 192, 77 A. 2d 447. However, the Act is confirmatory of a long existing public policy of the Commonwealth to protect the rights of widows, and irrespective of the husband's motive in creating an inter vivos trust which excludes his widow from participation in the trust fund, any doubt as to the effectiveness of the trust in this regard should be resolved in favor of the widow.

The decree of the court below is reversed and it is directed that all of the assets of the alleged inter vivos trust be surrendered and transferred to the Estate of James H. Pengelly to be administered by F. Edwin Titlow as executor under the terms of decedent's will, subject to the election by his widow, Katie W. Pengelly, to take against the will. Costs to be paid out of that portion of the estate that passes under the provisions of the will.